IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| DAIVON HEYWARD | : | CIVIL ACTION |
|---|---|---|
| | : | |
| v. | : | NO. 20-6098 |
| | : | |
| GARVIN, *et al.* | : | |

## MEMORANDUM

KEARNEY, J.                                                                                          May 11, 2021

A Philadelphia jury found Daivon Heyward guilty of murder in the first degree and
firearms offenses arising from the repeated shooting of his mother's boyfriend witnessed by
bystanders. Several lay and law enforcement witnesses testified confirming Mr. Heyward's
shooting. The trial judge provided cautionary instructions where required. The trial court sentenced
Mr. Heyward to life in prison without parole on the first-degree murder conviction. The trial court
denied post-sentence motions. The Pennsylvania appellate courts affirmed the verdict finding
sufficient evidence for conviction and rejecting a variety of evidentiary arguments. Mr. Heyward
then sought post-conviction relief arguing the ineffectiveness of his trial counsel in seven areas.
The Pennsylvania courts denied each ground for post-conviction relief. Mr. Heyward now seeks
habeas relief combining his evidentiary and ineffectiveness arguments rejected by the state courts.
We studied the voluminous record. We find no basis for an evidentiary hearing as there are no
disputed facts from the state court record. Our role is not to second guess the trial judge's
considered management or think we may have tried the case a different way. We cannot find the
Pennsylvania courts erred as a matter of federal law under our deferential habeas standards on the
collection of claims now brought to us. We deny and dismiss Mr. Heyward's petition. We find no
basis for a certificate of appealability.

**I.     Relevant facts adduced from the state court record.**

Gregory Smith arrived at the intersection of Germantown Avenue and Wister Street in Northwest Philadelphia, near the Sugar Stick Bar and Wister Street Plaza at approximately 11 PM on July 17, 2013. Around an hour later, Daivon Heyward—also known in the neighborhood as "Dai," "Dai Dai," or "Day"—came to the same location from Manheim Street and by crossing Germantown Avenue. Mr. Heyward approached Mr. Smith who he knew had been dating and living with Mr. Heyward's mother Dawn on and off. Mr. Smith sat on the wall outside the parking lot of the Wister Street Plaza. Mr. Smith began walking away on Wister Street after Mr. Heyward said something to him. Mr. Heyward followed Mr. Smith, pulled out a gun, and shot Mr. Smith twice. Mr. Smith fell to the ground. Mr. Heyward initially fled the scene but subsequently returned and fired three more shots, one of which hit Mr. Smith as he lay on the ground. Mr. Heyward then ran across Wister Street Plaza through an alleyway. Medical units later arrived at the scene and pronounced Mr. Smith dead.

Eyewitnesses Kyron Shorter and Shahere McDonald identified Mr. Heyward as the shooter.

Police arrested Mr. Heyward. The Commonwealth charged Mr. Heyward with murder, possessing a firearm as a former convict, possessing a firearm without a license, carrying a firearm on the public streets, and possessing an instrument of crime.[1]

Before trial, Mr. Heyward's trial counsel moved *in limine* to exclude testimony Mr. Heyward sold drugs.[2] The Commonwealth explained the drug sales may arise in Mr. Shorter's eyewitness testimony regarding alleged attempts by Mr. Heyward and an acquaintance of Mr. Heyward's to extort money from Mr. Shorter, because (1) Mr. Shorter attempted to sell marijuana in the area and (2) Mr. Shorter witnessed what happened the night of the murder.[3] The trial court

allowed the drug sale testimony as a basis for how Mr. Shorter recognized Mr. Heyward to the extent identification became a trial issue or if Mr. Heyward's trial counsel opened the door to this drug sale testimony.[4]

The Commonwealth presented trial testimony from Mr. Smith's family members, Mr. Shorter, Ms. McDonald, a medical examiner, and various police officers, detectives, and agents involved in the murder investigation.

### *Eyewitness Kyron Shorter's trial testimony.*

Mr. Shorter testified he had been living in the Germantown area for around five years before the day of the murder.[5] On the night of the shooting, Mr. Shorter was walking up Germantown Avenue from the Logan Street intersection towards Wister Street to buy marijuana.[6] As Mr. Shorter passed the Reger Street alley but before he reached Wister Street, he saw Mr. Heyward at the intersection of Manheim Avenue and Germantown Avenue.[7] Mr. Shorter testified he saw Mr. Heyward cross Germantown Avenue towards the Wister Street Plaza, where Mr. Smith stood.[8]

Mr. Shorter testified Mr. Smith said something to Mr. Heyward as Mr. Heyward approached him, but he could not hear what he said.[9] Mr. Smith turned and walked away from Mr. Heyward down Germantown Avenue and turned on Wister Street.[10] Mr. Shorter testified Mr. Heyward walked up behind Mr. Smith and shot him twice.[11] Mr. Shorter then saw Mr. Heyward flee the area through a breezeway for the Wister Street Plaza.[12] Mr. Shorter swore Mr. Heyward subsequently returned to the scene and fired three more shots while Mr. Smith was on the ground "twitch[ing]."[13] He then saw Mr. Heyward run away through the same breezeway of Wister Street Plaza towards a broken section of a fence in the rear of the parking lot leading to Collum Street.[14]

Mr. Shorter testified he did not tell the police or the mother of his child—with whom he lives—about what he saw.[15] Around a week after the murder, Mr. Shorter saw Mr. Heyward at a Chinese restaurant at the intersection of Germantown Avenue and Seymour Street.[16] Mr. Shorter testified Mr. Heyward told Mr. Shorter he could not stay in the neighborhood unless he gave Mr. Heyward money.[17] According to Mr. Shorter, Mr. Heyward attempted to extort money from Mr. Shorter for two reasons: (1) Mr. Shorter saw what happened on the night of the shooting; and (2) as a license for Mr. Shorter to continue selling marijuana in the neighborhood.[18]

Mr. Shorter further testified an acquaintance of Mr. Heyward named Keith approached Mr. Short near the corner of Seymour Street and Germantown Avenue on September 11, 2013—a little less than two months after the shooting.[19] According to Mr. Shorter, Keith demanded a sum of money so Mr. Shorter could stay in the neighborhood because he was a "rat."[20] Mr. Shorter contacted the police later the same day and had plainclothes officers pick him up on a different street so others would not see him entering a police cruiser.[21] Mr. Shorter then gave a statement to homicide detectives detailing what he had witnessed around midnight on July 18, 2013 and identifying Mr. Heyward from a photo array.[22] Mr. Shorter testified at the preliminary hearing about a month after this interview identifying Mr. Heyward as an individual he had known from the neighborhood since around 2010.[23]

During cross-examination, Mr. Heyward's counsel questioned Mr. Shorter about inconsistencies between his testimony at trial, testimony from the preliminary hearing, and his statement to detectives.[24] Defense counsel initially focused his questioning on where Mr. Shorter stood when the shooting took place, pointing out inconsistencies between the location stated during trial and at the preliminary hearing.[25] Defense counsel then challenged other inconsistencies in Mr. Shorter's recollection of the shooting, including where he first saw Mr. Heyward and the

clothes Mr. Heyward wore.[26] Mr. Shorter used various reference points throughout the courtroom to estimate how far he stood from Mr. Smith and from Mr. Heyward.[27] Mr. Shorter testified he stood around thirty-five feet from Mr. Smith and sixteen feet from Mr. Heyward when Mr. Heyward first shot Mr. Smith.[28]

Defense counsel concluded his cross-examination of Mr. Shorter by asking about the alleged extortion attempts by Mr. Heyward and his acquaintance, Keith, including:

> **DEFENSE COUNSEL:** This is what you said at the preliminary hearing on page 28.
>
>> Question. I will start at line 11.
>> Did anyone approach you and tell you why they need the money?
>> Your answer. Did anyone approach me telling me why they needed the money?
>> Question. Right. Why you need to give up the money?
>> Your answer. I guess because they was trying to make – I don't know. Just make me give money up just because I was a rat or something. I don't know. I don't know if they – I don't know if they heard something. I don't know. You recall being asked that question and giving that answer that you didn't know why you were asked to give up money?
>
> **MR. SHORTER:** No.
>
> **DEFENSE COUNSEL:** You don't recall that?
>
> **MR. SHORTER** No.
>
> **DEFENSE COUNSEL:** Next question. Was there a dollar amount?
> Do you remember that?
>
> **MR. SHORTER:** Yes
>
> **DEFENSE COUNSEL:** And what was the dollar amount?
>
> **MR. SHORTER:** Initially they said 12 hundred
>
> **DEFENSE COUNSEL:** Initially they said 12 hundred.
>> You were asked on page 29, question, was there any dollar amount ever talked about? Five hundred or two thousand? Was there a dollar amount talked about in terms of what you had to given this man?
>> Your answer. Four hundred and fifty dollars.
>> Question. Four hundred fifty?

Answer. Four hundred and fifty dollars.
And you told that to the detective too; is that correct?
Answer. Four hundred and fifty.
Question. I'm sorry. Did you tell that to the detective when you gave the
statement on the 11th?
Your answer. I believe so.
You recall being asked that question and giving those answers, sir?

**MR. SHORTER:** Yes.

**DEFENSE COUNSEL:** Did you tell the detective that the amount of money was
four hundred and fifty dollars?

**MR. SHORTER:** No. Not initially.

**DEFENSE COUNSEL:** At any time did you tell the detective that the amount of
money was four hundred and fifty dollars?

**MR. SHORTER:** Yes.

**DEFENSE COUNSEL:** And he wrote it down on your statement?

**MR. SHORTER:** Yes.

**DEFENSE COUNSEL:** You have your statement in front of you?

**MR. SHORTER:** (No response)

**MR. HANDRICH:** Could we direct the witness to page three, first full question
and answer?

**DEFENSE COUNSEL:** Question – No. Statement. 42. Page 3. First question. You
see that first question, how much did Keith tell you he wanted?

**MR. SHORTER:** Yes

**DEFENSE COUNSEL:** All right. And what did you tell the detective?

**MR. SHORTER:** 12 hundred.

**DEFENSE COUNSEL:** Is there any mention of four hundred fifty dollars in that
statement?

**MR. SHORTER:** No.
…

**DEFENSE COUNSEL:** And, sir, you waited almost two months after this incident before you went and told the police your story; is that correct?

**MR. SHORTER:** Yes.

**DEFENSE COUNSEL:** You recall testifying at the preliminary hearing on page 25, line 16, question, all right, how long after that conversation did you give a statement to the detective about what you claim you saw?
> Your answer. I gave the statement as soon as I got scared, as soon as he told me, as soon as he said that I had to give up money, that's when I called 911.
> Question. That same night or the next day?
> Answer. Next day. I said the following day.
> Question. So I believe the shooting occurred on July 18th of 2013; correct?

**MR. HANDRICH:** I'm going to object for the moment, Your Honor.

**COURT:** Let me see you at sidebar.
…
(A sidebar discussion was held off the record.)
…
**COURT:** Just for the record, I'm going to sustain the Commonwealth's objection to this particular line of questioning. So let's move on.[29]

After Mr. Shorter finished testifying and the jury left the courtroom for a break, the trial court proceeded to put the arguments regarding the line of questioning on the record.[30] The Commonwealth explained it objected because it appeared as though defense counsel, in using testimony from the preliminary hearing, attempted to ask about one alleged extortion attempt and Mr. Shorter responded with answers as to the other alleged extortion attempt.[31] Defense counsel explained he thought he should have been able to pursue this line of questioning because the Commonwealth could have rehabilitated the witness.[32] The trial court then explained why he sustained the Commonwealth's objection: "My view is that it was getting so confusing that I don't think the jury could have understood the difference."[33]

### Eyewitness Shahere McDonald's trial testimony.

Ms. McDonald testified she had just left her mother's home on the night of the shooting.[34] She stood at the corner of Manheim Street and Germantown Avenue waiting for a bus.[35] Two

establishments—a pharmacy and the Sugar Stick Bar—occupied a corner on either side of Manheim Street.[36] Ms. McDonald stood on the corner in front of the pharmacy.[37] She testified she saw Mr. Heyward coming down Germantown Avenue on the opposite side of the street.[38] Mr. Heyward then crossed the street to the side where Ms. McDonald stood and walked within five feet of her.[39] Ms. McDonald testified Mr. Heyward crossed back over Germantown Avenue toward three males standing at the Wister Street Plaza, pulled out a gun, and started shooting.[40] The three males immediately dispersed.[41] One of the males started running away down Germantown Avenue and turned left onto Wister Street.[42] Ms. McDonald testified Mr. Heyward followed that male, later determined to be Gregory Smith, and shot him on Wister Street.[43] Ms. McDonald then hid under a car for around fifteen minutes waiting for her bus.[44] When her bus arrived, she got out from underneath the car, boarded the bus, and went home.[45] She did not contact police upon arriving home.[46]

She instead spoke to Sylvester Mitchell, who she referred to as Mr. Smith's cousin, on the phone the day after the shooting.[47] Mr. Mitchell told Ms. McDonald he was grieving the loss of a loved one.[48] Upon hearing of Mr. Mitchell's loss, Ms. McDonald then told Mr. Mitchell the timing, location, and other details of the murder she witnessed the night before.[49] Mr. Mitchell told Ms. McDonald she needed to speak to detectives about what she saw.[50] Detectives then met Ms. McDonald at her home, where she told them everything she witnessed.[51] Ms. McDonald further agreed to give a formal statement at the homicide unit.[52]

Ms. McDonald testified she had never seen Mr. Heyward before the night of the shooting.[53] She testified his hair looked different that night than it appeared at trial; he previously had long hair in dreadlocks that had since been cut.[54] Ms. McDonald further testified she recognized Mr. Heyward's neck tattoo from when he passed by her the night of the shooting.[55]

8

During cross-examination, defense counsel questioned Mr. McDonald about her call with Mr. Mitchell.[56] Defense counsel further asked Ms. McDonald about her familiarity with Mr. Mitchell: "[a]nd you and [Mr. Mitchell] are pretty close; correct?"[57] Ms. McDonald responded "[w]e're close, yes. He's a great person."[58]

### *Additional non-eyewitness trial testimony.*

The victim's uncle Ditavious Smith testified he had planned to play pool with his nephew Gregory on the night of the shooting but later received a phone call he had been shot.[59] Uncle Ditavious testified Gregory and his girlfriend, Mr. Heyward's mother, had disagreements.[60] He stated he had never seen the victim lay hands on Mr. Heyward's mother, nor had he heard anything to that effect.[61] He further testified his nephew and Mr. Heyward disagreed on occasion and once had a physical altercation.[62]

The Commonwealth also called the victim's sister Joann Smith.[63] Sister Joann testified her brother and Mr. Heyward's mother argued sometimes.[64] She testified her brother told her of his problems with Mr. Heyward.[65] Defense counsel asked Sister Joann whether her brother physically abused Mr. Heyward's mother; Joann denied knowing anything about physical abuse.[66] Defense counsel then referenced the statement she gave to police the day after the murder stating she was aware of instances of physical abuse.[67] Sister Joann testified she did not remember making the statement to the police.[68] Sister Joann subsequently clarified, while her brother never told her he physically abused Mr. Heyward's mother, other people in her neighborhood told her it happened.[69]

Officer Lamont Fox of the Philadelphia Crime Scene Unit testified he arrived at the crime scene around 1:30 AM.[70] Officer Fox and his partner, Officer Clyde Frasier, secured the scene.[71] Officer Fox testified they recovered four fired cartridge casings—located within the space from the Germantown Avenue sidewalk near the wall to the Wister Street Plaza to the location of the

victim on Wister Street—and one strike mark from a building located at the corner of the Wister Street and Germantown Avenue intersection.[72] Two of the fired cartridge casings were spaced from each other by some distance down the sidewalk just outside the Wister Street Plaza and the remaining two casings were close to Mr. Smith's body.[73] Officer Gregory Welsh—an expert admitted in the field of ballistics and firearm identification—subsequently testified all four fired cartridge casings came from the same weapon.[74]

Officer Fox testified there is 121 feet and six inches between the opposite corner of Wister Street and Germantown Avenue and the victim's body.[75] He testified, relying on a photograph taken the night of the incident, a person standing where the decedent stood on the Wister Street sidewalk could not see the corner of Reger Street and Germantown Avenue because the corner building where the officers found the strike mark obstructed the view.[76] He testified the strike mark was associated with this incident because the markings indicated the building had just been impacted and fine granules of paint or dirt were present directly below the impact point on the ground.[77] Officer Fox estimated approximately fifty feet between the corner of Reger Street and Germantown Avenue to the corner of Wister Street and Germantown Avenue.[78]

Officer Frederick Clough, an officer in the District for eleven years, testified he and another officer responded to the 12:15 AM radio call relayed by police dispatch.[79] Officer Clough arrived to see the victim severely injured and unresponsive.[80] Officer Clough testified as to an opening in the fence located in the back of Wister Street Plaza which had not been repaired for the entire time he had been on patrol in the District, including the night of the incident.[81] He testified an individual could easily exit through the opening in the fence to access Collum and Lena Streets.[82]

The Commonwealth also presented testimony from Dr. Sam Gulino, the Chief Medical Examiner for the City of Philadelphia, admitted as an expert in forensic pathology.[83] Dr. Gulino

testified Dr. Ed Lieberman, an Associate Medical Examiner, conducted the autopsy of Mr. Smith and prepared a report of his findings.[84] Dr. Gulino agreed with Dr. Lieberman's conclusions.[85]

Dr. Gulino testified Mr. Smith died from a gunshot wound to the chest.[86] He testified Mr. Smith suffered three gunshot wounds—one to the left upper back, one to the right front part of the chest, and one to the left buttock.[87] The bullet to his chest broke his sternum and caused a tear in his heart.[88] This tear caused bleeding in the sac surrounding Mr. Smith's heart, ultimately leading to his death.[89] Dr. Gulino testified Dr. Lieberman recovered two bullet jackets during the autopsy later sent to the Firearm Identification Unit for analysis.[90]

Officer Anthony Comitalo testified he responded to a September 11, 2013 radio call at around 1:50 PM regarding an incident involving a person with a gun.[91] Officer Comitalo— plainclothes at the time—arrived at the corner of Ogontz and Olney Avenues.[92] Kyron Shorter approached Officer Comitalo and informed him two males in a relatively new Jeep Cherokee threatened him with a gun.[93] Officer Comitalo then transported Mr. Shorter back to the police station to talk to him further.[94] Mr. Shorter told Officer Comitalo he had information about the July murder of Gregory Smith committed by an individual with the nickname "Dai."[95] Officer Comitalo described Mr. Shorter as "very upset and nervous to the point where he was just shaking" on the scene and at the police station.[96]

Officer Comitalo's testimony caused Mr. Heyward's counsel to move for a mistrial at one stage:

**COMMONWEALTH:** So I'm going to ask you a couple questions about what [Mr. Shorter] told you.
> First I want to direct your attention to why Mr. Shorter called the police and had asked for help that day in terms of the Cherokee.
> Did he tell you who was in the Cherokee and what that person had either said to him or did to him?

**OFFICER COMITALO:** Initially at location, no, but eventually, yes.

11

**COMMONWEALTH:** And what did he say about the individual?

**DEFENSE COUNSEL:** I would object.

**COURT:** Overruled.

**OFFICER COMITALO:** He said that it was a male that he knew by the name of Dai and he was –

**DEFENSE COUNSEL:** Objection.

**COMMONWEALTH:** If I can, I will give the officer his interview. Did he tell you basically – Let me clarify –

**DEFENSE COUNSEL:** I move for mistrial.

**COURT:** We can deal with that not at this particular moment. I'm going to suggest that you do a little leading.[97]

Officer Comitalo testified Mr. Shorter told him people tried to extort money from him because of what he knew about the July murder.[98] Mr. Shorter also told Officer Comitalo there was a man named Keith inside the Cherokee.[99] Police could not locate Keith or the Cherokee.[100]

The trial court then addressed defense counsel's motion for a mistrial outside the presence of the jury.[101] The Commonwealth opposed the mistrial motion, arguing Officer Comitalo's testimony did not imply Mr. Heyward's presence in the Cherokee with a gun during the September 11 encounter.[102] The Commonwealth further argued confusion could be cured by instructing there is no evidence anybody displayed a gun during the September 11 incident with the Jeep Cherokee.[103] The trial court found:

**COURT:** Well, I'm prepared to deny your motion for mistrial.
What I would do is give the following cautionary instruction.
There's no evidence that anyone in the Jeep Cherokee had or showed a gun on September 11th when Mr. Shorter spoke with Officer Comitalo[.]

**DEFENSE COUNSEL:** Reflecting back on Mr. Shorter's testimony, he said there were two incidents. First as to Daivon, my client, at the Chinese store. Second incident involved Keith, that was my understanding, alone.

**COURT:** That's what I understood.
…

**DEFENSE COUNSEL:** And now you have this incident of Dai, Keith, and a third male inside the vehicle with an inference that, you know, there might have been a weapon involved.
And my request would be that in addition to that that there is no evidence that Dai was present in the that vehicle.

**COURT:** Okay.[104]

The trial court proceeded to give the jury the following cautionary instruction: "Before we proceed further, ladies and gentlemen, I just need to tell you that there is no evidence that anyone in the Jeep Cherokee had or showed a gun on September 11th when Mr. Shorter spoke with Officer Comitalo. Also there is no evidence that [Mr. Heyward] was present in the Jeep Cherokee."[105] Mr. Heyward's counsel did not object to this revised cautionary instruction.

The Commonwealth presented testimony from Detective Joseph Bamberski, the homicide detective assigned to Mr. Smith's case.[106] Detective Bamberski testified no eyewitnesses came forward with information about night of the murder.[107] He further testified detectives interviewed the victim's uncle Ditavious Smith the morning after the murder who informed them Sylvester Mitchell may have information about the murder.[108] Detectives contacted Mr. Mitchell who provided them a phone number for Ms. McDonald.[109] Detective Bamberski testified Ms. McDonald agreed to meet with him and other detectives at her home and later agreed to give a statement at the police station.[110] Detective Bamberski took a formal statement from Ms. McDonald at the police station and showed her a photo array from which Ms. McDonald identified Mr. Heyward.[111]

Detective Donald Murano testified police officers transported Mr. Heyward to the homicide unit.[112] Detective Murano testified he recorded all of Mr. Heyward's biographical information, including his neck tattoo.[113] He further asked Mr. Heyward for his cell phone and cell phone number which Mr. Heyward provided.[114] Mr. Heyward signed a Consent to Search Form allowing the police to search his phone.[115] Detective Murano then turned the phone over to Detective Bamberski.[116]

Detective Bamberski testified he received the cell phone and instructed another detective, Detective Graf, to prepare a search warrant for cell phone records from July 16, 2013 until July 23, 2013.[117] Detective Dunlap received cell phone and cell cite records produced by the cell phone company.[118] Special Agent William Shute of the Federal Bureau of Investigation eventually received the records for certification.[119]

Detective Bamberski testified he interviewed eyewitness Kyron Shorter around seven weeks after the murder.[120] He showed Mr. Shorter a photo array from which Mr. Shorter identified Mr. Heyward.[121] Detective Bamberski prepared an Affidavit of Probable Cause for Mr. Heyward's arrest and a judge issued an arrest warrant.[122] Detectives later arrested Mr. Heyward on this arrest warrant.[123]

Mr. Heyward's trial counsel asked Detective Bamberski about the name associated with the cell phone records.[124] Detective Bamberski testified the name on the records appeared to be Dawn Heyward, Mr. Heyward's mother.[125] Detective Bamberski testified he spoke with Ms. Heyward on July 19, 2013 and, during this interview, he asked about her cell phone number.[126] Ms. Heyward never stated she used the phone number for which detectives obtained cell phone records.[127] She instead provided two distinct phone numbers for the cell phones she shared with Mr. Smith.[128]

The Commonwealth presented homicide Detective Frank Mullen who assisted Detective Bamberski in obtaining video surveillance from the area surrounding the crime scene.[129] Detective Mullen testified they obtained footage from two external cameras pointed at the entrance of the Germantown Pharmacy located at the corner of Germantown Avenue and Manheim Street.[130] The cameras did not capture video of the shooting but captured Ms. McDonald walking in and out of the area.[131] The Commonwealth played portions of the video surveillance; as it played, Detective Mullen identified Ms. McDonald each time she reappeared on the video and explained where she appeared to be walking based on the angle of the cameras.[132] Mr. Heyward's counsel objected to the narration, arguing the video spoke for itself.[133] The trial court overruled the objection and allowed the Commonwealth to continue.[134]

Detective Mullen further testified to the report he reviewed from a member of the District Attorney's Office who conducted a forensic examination of Mr. Heyward's cell phone.[135] Through this review, Detective Mullen saw photographs stored on Mr. Heyward's phone.[136] Detective Mullen testified he saw numerous photos of Mr. Heyward, sometimes wearing t-shirts labeled with "Brick Yard," and photos of women in various states of undress.[137]

The Commonwealth also called Special Agent Shute admitted by the trial court as an expert in historical cell phone site analysis.[138] Special Agent Shute testified call detail records, like those provided by Detective Bamberski, provide information such as the date and time of a call, its duration, the originating phone number, and the receiving phone number.[139] The records provide the location of the cell phone tower to which the cell phone connects when initiating the call—called the originating cell cite—and the location of the tower used when the call terminates.[140]

Special Agent Shute testified he analyzed the call detail records he received from Detective Bamberski associated with the phone number Mr. Heyward provided to detectives. He specifically analyzed records of an approximately fifty-minute window between 11:38 PM on July 17th, 2013 through 12:19 AM on July 18th, 2013.[141] Special Agent Shute testified the phone made or received several calls within that time and utilized two cell phone towers in the general vicinity of the crime scene.[142] He further testified cell tower signals often overlap to some extent and cell phones search for the strongest signal by moving from tower to tower.[143] Special Agent Shute concluded, based on the records demonstrating the phone jumping from tower to tower between this time, the phone was located in the area of overlap between the two cell towers; this overlap area covered the area where the murder took place.[144]

### *The trial judge sentences Mr. Heyward to life in prison and later denies his post-trial motions.*

At the close of the five days of evidence, the trial judge charged the jury on murder in the first degree, murder in the third degree, carrying a firearm without a license, carrying a firearm on the public streets, and possessing an instrument of crime.[145] The jury found Mr. Heyward guilty of murder in the first degree and the three firearm offenses.[146] The trial judge sentenced Mr. Heyward to life imprisonment without parole for the first-degree murder conviction.[147] He imposed no further sentence for the firearm convictions based on the Commonwealth's recommendation.[148]

Mr. Heyward moved for post-sentence relief, arguing sufficiency of the evidence and trial errors and requesting the trial judge reverse his conviction grant a new trial.[149] Mr. Heyward first argued the Commonwealth's evidence is insufficient to support the guilty verdict because he acted under "intense passion resulting from serious provocation" rather than in a deliberate and premeditated manner.[150] He relatedly argued the trial court erred by failing to instruct the jury on

a voluntary manslaughter charge.[151] He finally argued the jury entered guilty verdicts against the weight of the evidence because the Commonwealth failed to demonstrate Mr. Heyward's presence at the shooting.[152]

The trial court denied Mr. Heyward's post-sentence motions.[153] Mr. Heyward appealed to the Pennsylvania Superior Court.[154]

### The Pennsylvania Superior Court affirms the trial court on Mr. Heyward's direct appeal.

Mr. Heyward raised seven issues on direct appeal.[155] He first challenged the sufficiency of the evidence, claiming the Commonwealth failed to prove beyond a reasonable doubt he was the perpetrator and, even if the Commonwealth did prove his involvement, it failed to prove he acted with the requisite intent to kill.[156] He also argued the jury returned verdicts against the weight of the evidence.[157] He finally claimed the trial court erred in five ways: (1) allowing testimony he and another individual attempted to extort money from Kyron Shorter; (2) limiting his opportunity to cross-examine Kyron Shorter regarding his testimony at the preliminary hearing and his statement to detectives; (3) denying his motion for a mistrial after the Commonwealth presented hearsay statements made by Kyron Shorter to Officer Anthony Comitalo; (4) allowing Detective Frank Mullen to narrate video surveillance played in court before the jury, thereby usurping from the jury its duty as the sole arbiter of facts; and (5) denying his request for a jury instruction of voluntary manslaughter.[158]

The trial court issued an opinion under Pennsylvania Rule of Appellate Procedure 1925(a).[159] The trial court found Mr. Heyward's sufficiency of the evidence argument lacked merit.[160] The trial court explained the Commonwealth adduced significant evidence—through the testimony of two eyewitnesses standing at different vantage points—Mr. Heyward shot and killed Mr. Smith.[161] The trial court further explained the Commonwealth adduced evidence Mr. Heyward

committed the murder with the specific intent to kill by demonstrating Mr. Heyward specifically sought out Mr. Smith, chased him down, and shot him twice, only to return to the scene and fire three more shots to ensure Mr. Smith's death.[162]

The trial court relatedly explained it declined Mr. Heyward's request to instruct the jury on voluntary manslaughter, a crime requiring proof the perpetrator acted under a sudden and intense passion, because the evidence adduced at trial did not support such an instruction and would confuse the jury.[163] The trial court explained no witnesses could confirm a violent relationship existed between Mr. Heyward and Mr. Smith to support a heat of passion theory.[164] The trial court concluded, "[b]oth Defendant's method in seeking out the decedent and the manner in which the assault took place undermine any rational reliance that this murder was committed in any manner other than with the specific intent to kill."[165]

The trial court next concluded Mr. Heyward's claim regarding the weight of the evidence lacked merit.[166] The trial court explained, to the extent Mr. Heyward premised his argument on the credibility of the witnesses, credibility determinations are the province of the jury and cannot be re-weighed by the court.[167] The trial court found Mr. Heyward failed to point to anything to discount the witnesses' testimony entirely.[168]

The trial court found it properly allowed the Commonwealth to adduce evidence, through Mr. Shorter's testimony, about two occasions during which Mr. Heyward or his acquaintance, Keith Williams, attempted to extort money from Mr. Shorter.[169] As Mr. Shorter's testimony began, the trial court explained it became clear the extortion attempts were "clearly relevant" because "[w]ithout the evidence, the jury would have been left with no explanation regarding why Mr. Shorter waited nearly two months to detail to the authorities what he had seen firsthand."[170]

The trial court next found it appropriately limited the scope of the cross-examination of Mr. Shorter as to the discrepancies between his preliminary hearing testimony and his statement to detectives regarding the extortion attempts.[171] The trial court found defense counsel engaged in this line of questioning not to show Mr. Shorter's bias, interest, or motive, but rather to create confusion among the jury by conflating two distinct events into one.[172]

The trial court found it properly denied Mr. Heyward's motion for a mistrial after Officer Comitalo testified inaccurately about statements made to him by Mr. Shorter.[173] The trial court explained the Commonwealth clarified Officer Comitalo's statement during the remainder of the direct examination.[174] The trial court explained it further remedied Officer Comitalo's inaccurate statement by issuing a curative instruction, relying on both attorneys to do so.[175] The trial court explained the extreme remedy of a mistrial was not warranted because the incorrect testimony, subsequently clarified by the Commonwealth and the court, did not deny Mr. Heyward a fair and impartial trial.[176]

The trial court finally found Detective Mullen's narration of portions of the video obtained from the pharmacy at the corner of Manheim Street and Germantown Avenue did not improperly usurp the jury's fact-finding function.[177] The trial court explained Detective Mullen simply told the jury, "limited by the size and quality of the video," when Ms. McDonald appeared in the video for a short time, ran out of the scope of the video's lens, and reappeared in the frame.[178]

The Pennsylvania Superior Court affirmed the trial court's judgment, expressly adopting its reasoning with respect to most of Mr. Heyward's claims.[179] Mr. Heyward timely petitioned for allowance of appeal to the Pennsylvania Supreme Court. The Pennsylvania Supreme Court denied his petition on December 21, 2016.[180]

*Mr. Heyward petitions for post-conviction relief citing his counsel's ineffective assistance.*

Mr. Heyward filed a *pro se* Post-Conviction Relief Act ("PCRA") petition almost a year later on November 25, 2017. Post-conviction counsel entered her appearance on behalf of Mr. Heyward on April 18, 2018. Post-conviction counsel subsequently filed an amended petition, claiming ineffective assistance of counsel violating Mr. Heyward's Sixth and Fourteenth Amendment rights based on seven arguments: (1) advising Mr. Heyward not to testify on his own behalf; (2) failing to timely notice an alibi defense and call an alibi witness, Niare Neal; (3) failing to move to suppress cell-site location information allegedly obtained by the Commonwealth without a valid search warrant; (4) failing to interview and call Christina Douglas, the mother of Mr. Heyward's child; (5) failing to develop and present evidence of an alternative suspect which would have established reasonable doubt; (6) failing to interview Ms. Jackson-McDonald before trial about her "special" relationship with Mr. Mitchell and impeach her at trial; and (7) the cumulative impact of the specific ineffective assistance claims.[181]

The post-conviction court dismissed Mr. Heyward's petition as meritless.[182] Mr. Heyward timely appealed. The post-conviction court issued an opinion recommending its dismissal be affirmed.[183]

The post-conviction court concluded it properly dismissed Mr. Heyward's claim of ineffective assistance in advising him not to testify on his own behalf at trial because Mr. Heyward failed to articulate specifically what advice counsel gave him or why he was not advised to testify.[184] The court further explained the record of Mr. Heyward's colloquy at trial made clear his decision not to testify was "knowingly, voluntarily, and intelligently made."[185]

The post-conviction court similarly found Mr. Heyward's argument regarding counsel's failure to call and notice an alibi witness failed for lack of factual development.[186] Mr. Heyward

20

failed to provide any confirmation Mr. Neal would have been willing to testify and the substance of his testimony.[187] Mr. Heyward further failed to show how his trial counsel's decision not to file a notice of alibi witness had no reasonable basis or trial strategy, and indeed, Mr. Heyward attached a certification from trial counsel explaining he had a tactical reason decision not to notice an alibi witness.[188]

The post-conviction court concluded Mr. Heyward's claim regarding trial counsel's failure to move to suppress cell-site location information lacked merit because the detectives obtained a search warrant including for this information.[189] The court explained the Commonwealth presented at trial the search warrant as well as testimony from the detectives who prepared and obtained the warrant.[190] The warrant for probable cause explicitly requested "… any and all subscriber information, as well as any and all call detail and text messaging information, **including cell site location**, from 7/16/13 until 7/23/13 …"[191] The post-conviction court concluded trial counsel could therefore not be ineffective in failing to move to suppress lawfully-obtained records.[192]

The post-conviction court found it properly dismissed Mr. Heyward's argument regarding counsel's failure to develop evidence of his mother as an alternate suspect.[193] The post-conviction court concluded, among other things, a speculative declaration from Mr. Heyward's biological father that Mr. Heyward and his mother had similar body types and could have been easily mistaken for each other was "speculative, irrelevant, and admissible," especially considering the fact both eyewitnesses to the murder clearly testified they saw a young male rather than a middle-aged woman.[194] The post-conviction court further found Mr. Heyward's mother was out of state, and therefore unavailable, during Mr. Heyward's trial.[195]

The post-conviction court found Mr. Heyward's argument trial counsel should have called Christina Douglas, the mother of Mr. Heyward's child, to be meritless because Ms. Douglas

conceded in her signed certification she could not provide substantive testimony about the night of the murder.[196] Mr. Heyward therefore failed to demonstrate either trial counsel should have interviewed Ms. Douglas or any prejudice resulted from this alleged failure.[197]

The post-conviction court next found Mr. Heyward's argument trial counsel failed to interview and impeach Ms. McDonald on her relationship with Mr. Mitchell to be meritless because trial counsel extensively questioned her and attempted to impeach her on the stand.[198] The post-conviction court further explained Mr. Heyward failed to adduce any evidence whatsoever, besides hearsay statements from his father and investigator, Ms. McDonald and Mr. Mitchell had a sexual relationship, and even assuming he had, how this would impact the outcome of the trial.[199]

The post-conviction finally concluded, because all of Mr. Heyward's individual claims of ineffective assistance of counsel failed, any claim based on the cumulative impact of the alleged errors also failed.[200]

The Superior Court affirmed the post-conviction court's dismissal.[201]

## II.  Analysis

Mr. Heyward now petitions for habeas relief with fourteen claims:

1. The Commonwealth failed to sustain its burden of establishing Mr. Heyward's guilt beyond a reasonable doubt;

2. The guilty verdicts are against the weight of the evidence;

3. The trial court erred in allowing the Commonwealth to present Mr. Shorter's testimony regarding alleged extortion attempts;

4. The trial court erred in limiting trial counsel's cross-examination of Mr. Shorter regarding his preliminary hearing testimony and statements to detectives about the alleged extortion attempts;

5. The trial court erred in denying Mr. Heyward's motion for a mistrial after Officer Comitalo testified to out-of-court statements made to him by Mr. Shorter;

6. The trial court erred in allowing Detective Mullen to narrate a videotape recording because this testimony usurped the fact-finding function of the jury;

7. The trial court erred in denying Mr. Heyward's request for a jury instruction as to voluntary manslaughter;

8. Ineffective assistance of trial counsel for failure to timely notice an alibi defense and call alibi witness, Niare Neal;

9. Ineffective assistance of trial counsel for advising him not to testify on his own behalf;

10. Ineffective assistance of trial counsel for failing to interview and call Christina Douglas, the mother of his child;

11. Ineffective assistance of trial counsel for failure to move to suppress cell-site location information allegedly obtained by the Commonwealth without a search warrant;

12. Ineffective assistance of trial counsel for failure to develop and present evidence of an alternative suspect;

13. Ineffective assistance of trial counsel for failure to interview Ms. McDonald about her "special relationship" with Mr. Mitchell and impeach her with that information at trial; and

14. The cumulative impact of trial counsel's errors denied him the right to a fair trial.[202]


The Commonwealth concedes Mr. Heyward's petition is timely and exhausted.

Congress, through the Antiterrorism and Effective Death Penalty Act ("AEDPA"), directs we "shall not" grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[203] As the Supreme Court instructs, this is a "highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt."[204]

The Supreme Court further instructs "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."[205] When making the "unreasonable application" inquiry, we "should ask whether the state court's application of clearly established federal law was objectively unreasonable."[206] We "may not issue the writ [of habeas corpus] simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."[207] We apply an objective standard; "[t]his distinction creates 'a substantially higher threshold' for obtaining relief than de novo review."[208]

Because state courts have "the duty and ability ... to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires 'a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error ... beyond any possibility for fairminded disagreement.' ... 'If this standard is difficult to meet'—and it is—'that is because it was meant to be.' We will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas relief is the remedy."[209]

"The test for § 2254(d)(2)'s 'unreasonable determination of facts' clause is whether the petitioner has demonstrated by 'clear and convincing evidence,' § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record."[210] Section 2254(e)(1) provides "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[211]

24

Where a habeas petitioner claims ineffective assistance of counsel, "review is 'doubly deferential,' because counsel is 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"[212] We are directed to "afford 'both the state court and the defense attorney the benefit of the doubt.'"[213]

Our Court of Appeals recently reminded us to "look to the highest state court to issue a reasoned opinion and examine its reasoning" when addressing a section 2254 petition.[214] The trial court's opinion rejecting Mr. Heyward's arguments regarding the sufficiency of the evidence, weight of the evidence, voluntary manslaughter jury instruction, the cross-examination of Mr. Shorter, and Detective Mullen's narration of the videotape, adopted without discussion by the Pennsylvania Superior Court, is the last reasoned decision, and we examine it under section 2254(d)'s standards.[215] The Pennsylvania Superior Court is the highest state court to issue opinions on Mr. Heyward's direct appeal as to the Rule 404(b) evidence, the motion for a mistrial, and post-conviction appeal based on ineffective assistance.

## A. The Commonwealth presented sufficient evidence to establish Mr. Heyward's guilt beyond a reasonable doubt.

Mr. Heyward initially argues the Commonwealth failed to prove the essential elements of the crimes charged beyond a reasonable doubt.[216] He argues, among other things, the Commonwealth failed to adequately establish his identity as the shooter, the ballistics evidence contracted the testimony of the Commonwealth's witnesses, and the video surveillance did not show Mr. Heyward at the scene of the crime.[217] The Commonwealth responds the state courts reasonably rejected Mr. Heyward's claim under clearly established federal law.[218] We agree with the Commonwealth.

"Principles of due process dictate that a person can be convicted of a crime only by proof of every element of the charged offense beyond a reasonable doubt."[219] The Supreme Court in

*Jackson v. Virginia* instructed us a petitioner is entitled to habeas relief based on evidentiary insufficiency only "if it is found upon the record evidence adduced at trial no rational trier of fact could have found proof beyond a reasonable doubt."[220] This inquiry does not require us to ask whether we believe "the evidence at the trial established guilt beyond a reasonable doubt" but instead requires we determine whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[221]

A first-degree murder conviction under Pennsylvania law requires the Commonwealth prove Mr. Heyward: (1) acted with the specific intent to kill; (2) unlawfully killed Mr. Smith; and (3) committed the killing.[222] The Commonwealth may prove intent through circumstantial evidence.[223]

The trial court concluded, upon review of the evidence adduced at trial, Mr. Heyward's claim lacked merit because the Commonwealth presented sufficient evidence to establish each of the elements of first-degree murder beyond a reasonable doubt.[224] First, the Commonwealth presented sufficient evidence through two eyewitnesses confirming: Mr. Heyward perpetrated the murder as both Mr. Shorter and Ms. McDonald testified Mr. Heyward pulled out a gun, chased Mr. Smith down Germantown Avenue, and shot Mr. Smith on Wister Street.[225] The trial court further found "significant evidence" Mr. Heyward had the requisite *mens rea* to support a first-degree murder conviction because he specifically sought out Mr. Smith to kill him.[226] The trial court explained Ms. McDonald testified, although Mr. Smith sat at the Wister Street Plaza with other individuals, Mr. Heyward only chased down Mr. Smith.[227] Mr. Shorter further testified Mr. Heyward fled the scene after firing his first shots but returned to fire three more shots at Mr. Smith

while he squirmed on the ground.[228] Cell phone records corroborated Mr. Shorter and Ms. McDonald's testimony.[229]

Mr. Heyward fails to demonstrate how the trial court's conclusion resulted from an unreasonable application of the clearly established federal law articulated in *Jackson* or from an unreasonable determination of the facts. The trial court reviewed the evidence adduced at trial, dutifully applied state law consistent with *Jackson*, and concluded the Commonwealth presented sufficient evidence to sustain the guilty verdict. We see no error in the trial court's reasoning as affirmed by the Superior Court warranting habeas relief.

The Commonwealth presented sufficient evidence to sustain the first-degree murder and firearm convictions conviction under the standard articulated in *Jackson*. The eyewitnesses' testimony corroborated by cell site location information persuade us a rational trier of fact could have found the essential elements of first-degree murder beyond a reasonable doubt. We deny Mr. Heyward's claim of insufficient evidence of guilt.

**B.      We cannot consider Mr. Heyward's state law weight of the evidence claim.**

Mr. Heyward next claims, relying on many of the same arguments made in his sufficiency of the evidence claim, he is entitled to a new trial because the guilty verdicts are against the weight of the evidence.[230] The Commonwealth argues Mr. Heyward's claim is not cognizable because it solely raises an issue of state law.[231] We agree with the Commonwealth.

To analyze a weight of the evidence claim, a court must evaluate the credibility of evidence presented at trial.[232] Federal courts reviewing habeas petitions are bound by the factual findings of state courts and are not permitted to redetermine witness credibility.[233] Weight of the evidence claims are therefore not cognizable in federal habeas proceedings.[234] We deny Mr. Heyward's claim challenging the sufficiency of the evidence.

27

C.   **The Pennsylvania Superior Court did not err in affirming the trial court's admission of Mr. Shorter's testimony regarding the alleged extortion attempts.**

Mr. Heyward next argues the trial court erred by allowing the Commonwealth to present testimony from Mr. Shorter regarding alleged attempts by Mr. Heyward and his acquaintance to extort money from Mr. Shorter.[235] Mr. Heyward argues this testimony "is akin to permitting the Commonwealth to present testimony concerning unrelated criminal activity."[236] The Commonwealth argues Mr. Heyward fails to provide a basis for us to upset the Pennsylvania Superior Court's ruling on this issue.[237]

Mr. Shorter testified he did not immediately tell the police or his girlfriend about the shooting. Around one week later, he saw Mr. Heyward at a Chinese restaurant, where Mr. Heyward demanded Mr. Shorter give him money to stay there. According to Mr. Shorter, Mr. Heyward asked for money because Mr. Shorter told people what he witnessed and because Mr. Shorter attempted to sell marijuana in the area. Mr. Shorter testified he saw a man named Keith, an acquaintance of Mr. Heyward, over one month after the murder and Keith demanded more money from Mr. Shorter. Later that day, Mr. Shorter contacted the police and told them everything he witnessed. Mr. Heyward's trial counsel attempted to impeach Mr. Shorter by questioning him about the amount of money sought during each extortion attempt, essentially conflating the two distinct encounters. The Commonwealth elicited testimony from Mr. Shorter regarding these amounts on redirect to clarify any confusion created by the cross-examination.

At the time of Mr. Heyward's trial, Pennsylvania Rule of Evidence 404(b) provided "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."[238] Such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent,

preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[239] In criminal cases, the trial judge may admit this evidence "only if the probative value of the evidence outweighs its potential for unfair prejudice."[240] The Pennsylvania Supreme Court also recognized a *res gestae* exception to Rule 404(b) allowing the trial judge to admit other crimes evidence "to furnish the context or complete story of the events surrounding a crime."[241]

The Superior Court—in addition to agreeing with the trial court's finding of relevancy of Mr. Shorter's testimony in explaining his two-month delay in talking to the police—concluded the trial court's admission of this testimony did not violate Rule 404(b).[242] The Superior Court explained the relevance of Mr. Shorter's testimony to describe the chain of events as well as to explain discrepancies in his testimony adduced by Mr. Heyward's trial counsel.[243]

Mr. Heyward's claim regarding the admissibility of Mr. Shorter's testimony is not cognizable to the extent he argues the state courts incorrectly applied state law—here, the Pennsylvania Rules of Evidence—because it is well settled "federal habeas corpus relief does not lie for errors of state law" and "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."[244] We properly focus only on "whether a conviction violated the Constitution, laws, or treaties of the United States."[245] Admission of "other crimes" evidence is a basis for federal habeas relief only if "the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial."[246] "[T]he question is whether [the prior bad acts] testimony 'in the context of the entire trial, w[as] sufficiently prejudicial to violate [his] due process rights.'"[247]

Mr. Heyward fails to explain how the probative value of Mr. Shorter's testimony is "so conspicuously outweighed by its inflammatory content" to violate his constitutional right to due process and a fair trial. As the state courts concluded, Mr. Shorter's testimony regarding the alleged

29

extortion attempts aided the jury in understanding why he waited two months to contact the police regarding what he witnessed the night of the shooting. We cannot find this probative value to be so conspicuously outweighed by any resulting prejudice so as to deny Mr. Heyward a fair trial. We deny Mr. Heyward's claim regarding the admissibility of Mr. Shorter's testimony on the alleged extortion attempts.

**D. The trial court properly limited defense counsel's cross-examination of Mr. Shorter with respect to his preliminary hearing testimony and his statements to detectives.**

Mr. Heyward next claims the trial court violated his Sixth Amendment rights by improperly limiting the cross-examination of Mr. Shorter with respect to the alleged extortion attempts.[248] The Commonwealth argues Mr. Heyward fails to articulate the unreasonableness of the state courts' rejection of this claim.[249]

The Commonwealth elicited testimony from Mr. Shorter about two distinct extortion attempts by Mr. Heyward and his acquaintance which occurred almost two months apart. Mr. Heyward's counsel—relying on the preliminary hearing notes of testimony and Mr. Shorter's statement to detectives—attempted to impeach Mr. Shorter by essentially conflating these two distinct events. The Commonwealth objected to the line of questioning, specifically defense counsel's use of the preliminary hearing testimony, because of the confusion it created. The trial court sustained the objection, explaining "[m]y view is that it was getting so confusing that I don't think the jury could have understood the difference."[250]

The Sixth Amendment guarantees every criminal defendant the right "to be confronted with the witnesses against him."[251] This right includes the ability of every criminal defendant to test the credibility of witnesses through cross-examination.[252] The Supreme Court held, however, "[i]t does not follow ... that the Confrontation Clause of the Sixth Amendment prevents a trial

30

judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness."[253] The trial court instead retains discretion to impose reasonable limits on the scope of cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."[254] In sum, the Sixth Amendment "guarantees *an opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."[255]

The trial court found it properly limited the cross-examination as to this line of questioning because it "did not lend to Mr. Shorter's bias, interest or motive" and was instead only "meant to create confusion in the minds of the empaneled jury …"[256] Its ruling thus "merely prevented the use of the preliminary hearing notes in a distorted fashion."[257] The Superior Court affirmed the trial court and adopted its reasoning.

Mr. Heyward fails to explain how these determinations resulted from an unreasonable application of the Supreme Court's Sixth Amendment jurisprudence. While Mr. Heyward had a constitutional right to cross-examine Mr. Shorter, the trial court retained the discretion to impose reasonable limits on the scope of cross-examination. Defense counsel attempted to impeach Mr. Shorter by relying on earlier testimony to conflate two distinct events months apart. The trial court sustained the Commonwealth's objection to the line of questioning, explaining it only served to confuse the jury as to these events. We cannot find this conclusion runs afoul of Supreme Court precedent. We deny Mr. Heyward's claim based on the trial court's limitations on the cross-examination of Mr. Shorter.

**E.** **The trial court properly denied Mr. Heyward's motion for a mistrial based on Officer Comitalo's testimony.**

Mr. Heyward next claims the trial court erred in denying his request for a mistrial after Officer Comitalo testified erroneously regarding out of court statements made to him by Mr. Shorter.[258] Mr. Heyward further argues the trial court's cautionary instruction to the jury did not cure the prejudice caused by Officer Comitalo's testimony.[259] The Commonwealth argues Mr. Heyward fails to articulate why the state courts erred in rejecting this claim.[260]

Officer Comitalo testified he went to the corner of Ogontz and Olney Avenues on September 11, 2013 after Mr. Shorter claimed he had been threatened with a gun by two males in a Jeep Cherokee. Mr. Shorter voluntarily accompanied Officer Comitalo and other officers to the police station to provide a statement regarding what he witnessed the night of the murder. Officer Comitalo then testified as to certain statements made to him by Mr. Shorter. Officer Comitalo erroneously testified Mr. Shorter told him "Dai," or Mr. Heyward, was in the Jeep. Defense counsel immediately moved for a mistrial based on this statement.

The trial court denied Mr. Heyward's counsel's motion for a mistrial gave the jury a cautionary instruction: "There's no evidence that anyone in the Jeep Cherokee had or showed a gun on September 11 when Shorter spoke with Officer Comitalo." Defense counsel requested, in addition to this cautionary instruction, the trial court instruct the jury as to absence of evidence Mr. Heyward was present in the Jeep Cherokee. The trial court then gave the following cautionary instruction: "[T]here is no evidence that anyone in the Jeep Cherokee had or showed a gun on September 11th when Mr. Shorter spoke with Officer Comitalo. Also there is no evidence that [Mr. Heyward] was present in the Jeep Cherokee." Defense counsel did not object to this cautionary instruction.

32

Mr. Heyward argues the cautionary instruction failed to cure the prejudice from Officer Comitalo's testimony. We disagree. "It is well established that, absent extraordinary circumstances, jurors are presumed to follow the instructions given to them by the court."[261] The trial court provided a clear cautionary instruction clarifying the Commonwealth did not present any evidence Mr. Heyward was in the Jeep or that anyone in the Jeep had a gun. The jury is presumed to follow this instruction absent extraordinary circumstances not at issue today. We find the Superior Court's conclusion the cautionary instruction "alleviated any prejudice caused by Officer Comitalo's testimony" did not result from an unreasonable application of federal law or from an unreasonable determination of the facts. We deny Mr. Heyward's claim challenging the trial court's denial of his counsel's mistrial motion.

### F. The trial court's decision to allow Detective Mullen to narrate portions of the videotape shown at trial is not cognizable on federal habeas review.

Mr. Heyward next claims the trial court erred in allowing Detective Mullen to narrate portions of video surveillance obtained from the pharmacy located at the corner of Manheim Street and Germantown Avenue.[262] He argues this testimony improperly usurped the fact-finder's function to determine the contents of the videotape.[263] The Commonwealth responds Mr. Heyward's claim fails because it solely alleges an error of state law and the state courts properly concluded the claim lacked merit.[264] We agree with the Commonwealth.

The Commonwealth played portions of a videotape during Detective Mullen's testimony. The video showed eyewitness Ms. McDonald walking in and out of the scope of the camera's lens near the scene of the crime. The Commonwealth repeatedly paused the video and asked Detective Mullen to identify when Ms. McDonald appeared in the video, when she left the scope of the lens, and when she subsequently reappeared. Mr. Heyward's counsel objected to Detective Mullen's

33

narration, arguing the video spoke for itself. The trial court overruled the objection and allowed the narration to continue.

The trial court found it properly allowed Detective Mullen's testimony regarding the videotape because he simply told the jury about Ms. McDonald's whereabouts on the video.[265] The trial court explained Detective Mullen did not use descriptive terminology which would have improperly interfered with the credibility determination of the jury.[266] The Superior Court affirmed the trial court and adopted its reasoning.[267]

We conclude Mr. Heyward's claim is not cognizable under federal habeas review. We cannot determine whether the trial court erred in allowing Detective Mullen's testimony as a matter of state evidentiary law because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."[268] Mr. Heyward fails to explain how the trial court's admission of Detective Mullen's testimony ran afoul of the Constitution or clearly established federal law. And we cannot find a Supreme Court case holding or suggesting the admission of lay opinion testimony violates due process.[269] The admission of Detective Mullen's testimony is therefore not cognizable on federal habeas review. We deny Mr. Heyward's claim challenging the admissibility of Detective Mullen's narration accompanying the video evidence.

**G.     The trial court's decision not to instruct the jury on voluntary manslaughter is not cognizable on federal habeas review.**

Mr. Heyward's final claim from his direct appeal contends the trial court erroneously failed to instruct the jury on voluntary manslaughter.[270] He argues he presented evidence Mr. Smith abused Mr. Heyward's mother, which lends support to the theory he acted under the heat of passion and the judge should have instructed on voluntary manslaughter.[271] The Commonwealth argues Mr. Heyward's claim is not cognizable on federal habeas review because it solely implicates issues of state law.[272] We agree with the Commonwealth.

Federal courts reviewing habeas claims cannot "reexamine state court determinations on state-law questions."[273] A federal habeas court is "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."[274] We cannot review the trial court's decision not to provide a voluntary manslaughter instruction because it is solely a question of state law and "does not raise any constitutional implications."[275]

Even if Mr. Heyward's claim raised constitutional concerns, we would agree with the trial court's conclusion the evidence adduced at trial did not support a voluntary manslaughter instruction. Under Pennsylvania law, an individual is guilty of voluntary manslaughter if, at the time of the killing, he "act[ed] under a under a sudden and intense passion resulting from serious provocation" by the individual killed.[276] "Heat of passion" includes emotions such as "anger, rage, sudden resentment or terror, which renders the mind incapable of reason."[277]

Mr. Heyward claims the testimony of Mr. Smith's uncle and sister supported such an instruction. We disagree. Ditavious Smith, Mr. Smith's uncle, testified Mr. Smith, Mr. Heyward, and his mother had disagreements from time to time. He knew nothing further and testified of not being aware of Mr. Smith ever abusing Mr. Heyward's mother. Mr. Smith's sister, Joann Smith, similarly testified Mr. Smith and Mr. Heyward's mother argued but she had no personal knowledge her brother physically abused Mr. Heyward's mother. She testified she heard about instances of physical abuse from other people in the neighborhood. As the trial court explained, these witnesses failed to confirm the existence of a violent relationship between Mr. Smith and Mr. Heyward's mother to potentially support a voluntary manslaughter instruction.

The evidence adduced at trial instead supported Mr. Heyward specifically intended to kill Mr. Heyward. The evidence showed Mr. Heyward arrived at the scene, already armed, and sought out Mr. Smith to kill him. After chasing Mr. Smith and shooting him twice, he fled the scene and

35

later returned to shoot Mr. Smith as he lay squirming on the ground. As the trial court aptly concluded, "[b]oth [Mr. Heyward]'s method in seeking out the decedent and the manner in which the assault took place undermine any rational reliance that this murder was committed in any manner other than with the specific intent to kill."[278]

We deny Mr. Heyward's claim challenging the trial court's decision to not instruct the jury on voluntary manslaughter.

### H. Mr. Heyward cannot sustain an ineffective assistance of counsel argument.

Mr. Heyward makes six specific ineffective assistance of counsel claims rejected by the Pennsylvania Superior Court. He again argues his trial counsel ineffectively (1) advised him not to testify on his own behalf; (2) failed to timely notice an alibi defense and call an alibi witness, Niare Neal; (3) failed to interview and call as a witness Christina Douglas; (4) failed to develop and present evidence of an alternative suspect, his mother; (5) failed to interview Ms. McDonald about her special relationship with Mr. Mitchell and impeach her at trial with this information; and (6) failed to move to suppress cell-site location information presented by the Commonwealth.[279] He lastly argues the cumulative impact of these errors deprived him of the right to a fair trial.[280]

We apply the two-prong standards of *Strickland v. Washington* when assessing claims of ineffective assistance of counsel and require a petitioner show both his trial counsel's deficient performance and prejudice.[281] Under *Strickland*, a petitioner must first establish counsel's performance fell below an objective standard of reasonableness. The Supreme Court in *Strickland* directed us to be highly deferential when assessing counsel's performance. The Court requires we apply a strong presumption trial counsel's conduct falls within the wide range of reasonable professional assistance. The petitioner must then show his counsel's deficient performance

prejudiced him by finding "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[282]

The Pennsylvania Supreme Court "refined the *Strickland* performance and prejudice test into a three-part inquiry. To prove counsel ineffective, the petitioner must show : "'(1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice befell petitioner from counsel's act or omission.'"[283] Our Court of Appeals earlier held Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to *Strickland*."[284]

We review Mr. Heyward's ineffective assistance claims "through the lens" of section 2254; "we cannot disturb a ruling of the state court unless it 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]' or it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"[285] We give "wide deference to the state court's conclusions, disturbing them only if the state court unreasonably applied ... the prongs of Strickland."[286] "The ultimate question is whether counsel's performance fell below 'an objective standard of reasonableness,'" a "deferential standard that becomes 'doubly' so when combined with the deferential" standard under section 2254.[287]

### 1. We find no ineffectiveness in failing to notice an alibi and call an alibi witness.

Mr. Heyward initially argues ineffectiveness of counsel for failing to file notice of an alibi and for failing to call Niare Neal as an alibi witness.[288] Mr. Heyward bases this claim on the pretrial investigator's description of his interview with Mr. Neal in his investigative report:

> He informed us that [Mr. Heyward] was staying with him at his residence and he was at his residence during the time of the shooting.

37

> He stated that the only time [Appellant] left the house that day was for approximately (1) hour when he went to see his son, Jayden Heyward, at his baby's mother's house, who lived around the block.
>
> He is also willing to appear in court to testify on behalf of [Mr. Heyward].[289]

Mr. Heyward included a certification in his amended PCRA petition that, if the post-conviction court conducted an evidentiary hearing, the investigator "will testify consistent with his report" and Mr. Heyward would testify "Neal was present and willing to testify during [his] trial but was not called by the defense."[290]

The post-conviction court concluded Mr. Heyward's claim failed for lack of factual development.[291] The court applied the standard established by the Pennsylvania Supreme Court in *Commonwealth v. Sneed*[292] for a petitioner to satisfy the performance and prejudice requirements of *Strickland* when raising a claim regarding failure to call a potential witness.[293] Under *Sneed*, a petitioner must establish: "(1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the [petitioner] a fair trial."[294] The court in *Sneed* further explained "[t]o demonstrate *Strickland* prejudice, a petitioner 'must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case.'"[295] And "[a] failure to call a witness is not per se ineffective assistance of counsel for such decision usually involves matters of trial strategy."[296]

The post-conviction court found Mr. Heyward's claim failed under *Sneed* because Mr. Heyward failed to provide a certification from Mr. Neal confirming he is a willing witness and explaining what the substance of his testimony would be.[297] He further failed to include Mr. Neal on the list of potential witnesses for an evidentiary hearing.[298] The post-conviction court found Mr.

Heyward based his claim entirely on inadmissible hearsay statements from the investigative report.[299] With respect to Mr. Heyward's argument regarding trial counsel's failure to file a notice of alibi witness, the post-conviction court found it too failed because Mr. Heyward failed to demonstrate the decision lacked a reasonable basis or strategic motive.[300] The trial court instead found Mr. Heyward attached a certification from trial counsel explaining he had a tactical basis for his decision not to file a notice of alibi.[301]

The Superior Court agreed with the post-conviction court's reasoning.[302] The Superior Court explained a post-conviction petitioner's request for an evidentiary hearing must contain "a certification, signed by the petitioner, as to each intended witness, identifying the witness's name, address, date of birth, the expected substance of his or her testimony, and any documents material to that testimony .... Failure to substantially comply with this requirement will render the proposed witness's testimony inadmissible."[303]

The Superior Court found it significant Mr. Heyward did not include Mr. Neal on his list of witnesses for the evidentiary hearing.[304] It further found, despite Mr. Neal's alleged availability to cooperate when the investigator purported his report, "it does not necessarily follow that Mr. Neal was still available and willing to cooperate when trial commenced" a year later.[305] The Superior Court agreed with the post-conviction court "[w]ithout a certification indicating that Mr. Neal himself was willing to testify to these circumstances at an evidentiary hearing," Mr. Heyward failed to satisfy the merit prong of his claim.[306]

Mr. Heyward fails to articulate how the Superior Court's determination resulted from an unreasonable application of *Strickland* or from an unreasonable determination of the facts. Pennsylvania's standard for evaluating ineffective assistance of counsel claims is consistent with *Strickland* and the Superior Court properly applied that standard here.

## 2. We find no ineffectiveness from counsel's advice to not testify at trial.

Mr. Heyward next argues ineffectiveness of trial counsel for advising him not to testify on his own behalf at trial.[307] Mr. Heyward argues, although he waived his constitutional right to testify at trial, trial counsel did not discuss the advantages and disadvantages of this waiver and instead advised him to "tell the court he did not want to testify when the judge asked him and let [trial counsel] do all the talking."[308] Mr. Heyward further argues he did not waive his right intelligently.[309]

After the Commonwealth rested its case at trial, the trial judge conducted a colloquy regarding Mr. Heyward's right to testify including:

> **COURT:** So I need to ask you these specific questions. First. Have you discussed with [trial counsel] the decision whether or not you should testify?
>
> **MR. HEYWARD:** Yes.
>
> **COURT:** After discussing that with [trial counsel], have you, on your own, made a decision whether or not to testify, and just tell me yes or no?
>
> **MR. HEYWARD:** Yes.
>
> **COURT:** What decision have you reached?
>
> **MR. HEYWARD:** Not to testify.
>
> **COURT:** Are you satisfied with your attorney's advice and representation?
>
> **MR. HEYWARD:** Yes, I am.[310]

The post-conviction court first denied this argument after concluding Mr. Heyward's claim lacked factual development because he only contended, without more, his trial counsel advised him not to testify.[311] The post-conviction court explained Mr. Heyward failed to articulate the "bad advice" trial counsel provided or any nexus between this alleged bad advice and his ultimate decision not to testify.[312]

The post-conviction court further denied Mr. Heyward's claim because the record of the trial court's waiver colloquy made clear Mr. Heyward knowingly, voluntarily, and intelligently decided not to testify.[313] The post-conviction court explained under applicable case law, "[i]t is well settled that a defendant who made a knowing, voluntary, intelligent waiver of testimony may not later claim ineffective assistance of counsel for failure to testify."[314] The Superior Court agreed Mr. Heyward's claim lacked merit because of the waiver colloquy and concluded the post-conviction court properly construed applicable case law.[315] It added "[a] defendant will not be afforded relief where he voluntarily waives the right to take the stand during a colloquy with the court, but later claims that he was prompted by counsel to lie or give certain answers."[316]

Reviewing the state courts' conclusion through the deferential lens of section 2254, we cannot find they resulted from an unreasonable application of *Strickland* or from an unreasonable determination of the facts. As the state courts explained, Mr. Heyward fails to articulate the alleged bad advice rendered by trial counsel and a connection between that advice and his decision to waive his constitutional right not to testify.

### 3. We find no ineffectiveness from counsel not calling Ms. Douglas as a witness.

Mr. Heyward next argues ineffectiveness of counsel for failing to interview and call Ms. Douglas, the mother of Mr. Heyward's child, as a witness at trial.[317] He argues, pointing to the investigator's pretrial report, trial counsel knew Mr. Heyward went to see his child at Ms. Douglas's home at some point on the day of the murder and should have interviewed her or subpoenaed her to testify at trial.[318] He also attached a signed statement from Ms. Douglas to his amended PCRA petition which, in relevant part, read:

I never spoke to a police officer or investigator. I don't have independent recall of the night of the murder. If I had been questioned sooner I might have remembered the date. All I know is that [Mr. Smith] was killed and [Mr. Heyward] was arrested

41

soon afterwards. If I had been questioned sooner I maybe could have said [Mr. Heyward] was here. It's possible since he was here so frequently.[319]

The post-conviction court denied this ineffectiveness claim because Mr. Heyward could not demonstrate prejudice from trial counsel's alleged failure.[320] The post-conviction court found Ms. Douglas's statement confirmed she could not offer substantive testimony because she lacked a recollection of what transpired on the night of the murder.[321]

The Superior Court agreed with the post-conviction court's analysis of Ms. Douglas's statement and emphasized it "does not actually establish that she ever possessed information beneficial for the defense."[322] The Superior Court next analyzed Mr. Heyward's claim trial counsel should have conducted a pretrial interview with Ms. Douglas under *Commonwealth v. Johnson*.[323] In *Johnson*, the Pennsylvania Supreme Court established counsel's duty to investigate claims:

> Counsel has a general duty to undertake reasonable investigations or make reasonable decisions that render particular investigations unnecessary. Counsel's unreasonable failure to prepare for trial is "an abdication of the minimum performance required of defense counsel." The duty to investigate, of course, may include a duty to interview certain potential witnesses; and a prejudicial failure to fulfill this duty, *unless pursuant to a reasonable strategic decision*, may lead to a finding of ineffective assistance.[324]

The Superior Court found trial counsel "endeavored to satisfy his general duty to undertake a reasonable pretrial investigation" under *Johnson*, most notably by having the benefit of a pretrial investigative report.[325] And while this duty may have extended to a duty to interview Ms. Douglas, Mr. Heyward failed to offer input, through a certification, from trial counsel as to whether he had a reasonable strategic basis for his decision.[326] Without this vital information, the claim failed.[327]

We cannot conclude, and Mr. Heyward fails to provide a basis for us to find, the Superior Court unreasonably applied clearly established federal law as articulated in *Strickland* or unreasonably determined the facts.

42

### 4.    We find no ineffectiveness in not developing an alternative suspect.

Mr. Heyward next argues ineffectiveness of counsel for failing to develop evidence of his mother, Dawn Heyward, as a credible alternative suspect because she had the motive and opportunity to murder her abusive partner.[328] He relies on a signed statement from his biological father which, in relevant part, states:

> From the description that Ms. [McDonald] provided the person was mostly identified via body-type. The description could be almost anyone including [Mr. Heyward's] own mother. My former wife was once a beautiful woman with a figure like Halle Berry and long flowing hair. As her drug and alcohol abuse escalated she became emaciated and cut her hair short. From a distance it was difficult to tell the difference between Dawn and [Mr. Heyward]. They were similar in height and body type.[329]

The post-conviction court concluded Mr. Heyward's claim lacked merit. It found the father's opinion regarding similar body types "speculative, irrelevant, and inadmissible" and the jury already rejected Mr. Heyward's other attempts to implicate his mother at trial.[330] The Superior Court agreed Mr. Heyward's claim lacked merit, explaining the father's statements "did not tend to make a fact at issue more or less probable."[331] It further found trial counsel repeatedly raised questions regarding the difficulty of identifying Mr. Heyward during his cross-examination.[332]

Mr. Heyward fails to articulate how the Superior Court's evaluation of his claim resulted from an unreasonable application of the *Strickland* standard or from an unreasonable determination of the facts in light of the record. We conclude the Superior Court did not unreasonably apply the performance and prejudice prongs in rejecting Mr. Heyward's claim.

### 5.    We find no ineffectiveness in not impeaching Ms. McDonald on her relationship with Mr. Mitchell.

Mr. Heyward argues ineffectiveness of trial counsel for failing to interview Ms. McDonald about the nature of her relationship with Mr. Mitchell.[333] He argues trial counsel would have found

out they had a sexual relationship, and he could have used this information to impeach her at trial.[334]

Ms. McDonald testified she did not approach the police the evening of the shooting due to fear. She spoke to one of Mr. Heyward's cousins—she could not remember his name—about the shooting on the day after the murder. She explained Ms. Heyward's cousin encouraged her to talk to the detectives about what she witnessed, and the police contacted her shortly thereafter. The Commonwealth subsequently showed her a photograph of Sylvester Mitchell and Ms. McDonald identified him as the man she spoke to over the phone.

Mr. Heyward's counsel extensively questioned Ms. McDonald and attempted to impeach her in various ways, including with her interaction with Mr. Mitchell and the fact Mr. Mitchell gave her a description of the murder suspect.[335] As to her relationship with Mr. Mitchell, trial counsel specifically asked Ms. McDonald: "And you and [Mr. Mitchell] are pretty close; correct?"[336] She responded "[w]e're close, yes. He's a great person."[337] During his closing argument, trial counsel again raised Ms. McDonald's phone call with Mr. Mitchell, explaining Mr. Mitchell provided her with Mr. Heyward's description leading to his identification. [338]

In his amended PCRA petition, Mr. Heyward attached an affidavit from a private investigator (hired by post-conviction counsel) about the investigator's interview with Ms. McDonald. In relevant part, the private investigator swore: "[Ms. McDonald] further claimed that she learned the details of the case the next day from [Mr. Mitchell] who was her 'special friend' with whom she had a sexual relationship. He was a relative of the deceased and filled her in on the details of the matter from his personal knowledge."[339]

The post-conviction court found Mr. Heyward's claim without merit because he failed to adduce evidence of a sexual relationship between Ms. McDonald and Mr. Mitchell outside of

hearsay statements from his father and the investigator.[340] Nor did Mr. Heyward explain how this information about a sexual relationship would have changed the outcome of the trial.[341] The Superior Court agreed with the post-conviction court's conclusion, finding trial counsel—by eliciting testimony of the close friendship between Mr. Mitchell and Ms. McDonald—"provid[ed] a basis for the jury to question the credibility of Ms. []McDonald's account of the murder."[342] The Superior Court found further information regarding the specific nature of their relationship would have been irrelevant.[343]

We cannot conclude the state courts' rejection of Mr. Heyward's claim resulted from an unreasonable application of the *Strickland* prongs or from an unreasonable determination of the facts. And Mr. Heyward fails to argue why habeas relief is warranted on this issue. We deny Mr. Heyward's ineffective assistance claim on this ground.

### 6. We find no ineffectiveness in failing to move to suppress cell-site location information.

Mr. Heyward argues ineffectiveness of counsel for failing to move to suppress cell-site location information allegedly obtained by the Commonwealth without a search warrant.[344] He argues the Supreme Court in *Carpenter v. United States* held the seizure of cell-site location information without a warrant supported by probable cause violated the Fourth Amendment.[345] The Commonwealth argues Mr. Heyward fails to show how the state courts' adjudication of his claim resulted from an unreasonable application of federal law or from an unreasonable determination of the facts.[346] We agree with the Commonwealth.

Detective Murano testified Mr. Heyward provided him a cell phone and executed a Consent to Search Form allowing the police to search his phone. Detective Bamberski then testified he received the cell phone and instructed another detective, Detective Graf, to prepare a search warrant for cell phone records. The Commonwealth presented the search warrant at trial. The

warrant for probable cause requested "… any and all subscriber information, as well as any and all call detail and text messaging information, including cell site location, from 7/16/13 until 7/23/13 …" Special Agent Shute, admitted as an expert in historical cell phone site analysis, subsequently testified as to his analysis of the cell-site location information obtained from the cell phone Mr. Heyward provided to detectives.

The post-conviction court found this ineffectiveness claim lacked merit because the Commonwealth adduced evidence at trial the detectives did, in fact, obtain a valid search warrant for the cell-site location information.[347] The post-conviction court explained trial counsel could not be ineffective for failing to move to suppress lawfully obtained data.[348] Even if they had not obtained a warrant, the post-conviction court explained the Supreme Court decided *Carpenter* four years after Mr. Heyward's trial and trial counsel could not be held responsible for post-trial changes in the law.[349] The Superior Court did not specifically address this claim in affirming the post-conviction court's denial of Mr. Heyward's petition.

Mr. Heyward fails to articulate how the post-conviction court's conclusion—affirmed by the Superior Court—resulted from an unreasonable application of Supreme Court precedent or from an unreasonable determination of the facts. Mr. Heyward's argument hinges on his assertion the Commonwealth failed to obtain a warrant for cell-site location information. The trial record directly contradicts his assertion. We conclude the state courts did not unreasonably apply *Strickland* or unreasonably construe the facts in denying Mr. Heyward's claim.

### 7. We find no ineffectiveness in considering the cumulative impact of alleged errors.

Mr. Heyward lastly argues ineffectiveness of counsel based on the cumulative impact of the specific instances of errors.[350] The post-conviction court found this claim failed because "Pennsylvania courts have 'repeatedly held that no number of failed claims may collectively

warrant relief if they fail to do so individually.'"[351] The Superior Court agreed.[352] It added the Pennsylvania Supreme Court recognized in *Commonwealth v. Elliott* "[w]hen the failure of individual claims is based upon a lack of prejudice ... the cumulative prejudice from those individual claims may properly be assessed."[353] The Superior Court nevertheless held Mr. Heyward's claim failed because it did not reject Mr. Heyward's individual claims based on the prejudice prong of *Strickland* and, thus, "there can be no aggregation of prejudice from multiple ineffectiveness claims."[354]

"[E]rrors that individually do not warrant habeas relief may do so when combined."[355] In evaluating a claim based on cumulative errors, we consider guilt-phase errors we have identified and apply the harmless error standard on collateral review set forth in *Brecht v. Abrahamson.*[356] Under this standard, "[c]umulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'"[357]

We cannot conclude the Superior Court's rejection of Mr. Heyward's cumulative impact claim resulted from an unreasonable application of Supreme Court precedent. We have not found errors in the state courts' rejection of Mr. Heyward's specific ineffective assistance claims. Mr. Heyward is not entitled to habeas relief based on any claim of cumulative prejudice. We deny Mr. Heyward's ineffective assistance claim on this ground.

## I.    There is no need for an evidentiary hearing.

Mr. Heyward asks us to vacate his conviction and sentence and grant him a new trial. He also contends we should conduct an evidentiary hearing.[358]

Our Court of Appeals recently discussed the standard for holding an evidentiary hearing in the context of a section 2255 habeas petition. In *United States v. Scripps*, our Court of Appeals

remanded to the district court for an evidentiary hearing on the convicted defendant's section 2255 petition asserting ineffective assistance of counsel.[359] At trial, the district court offered trial counsel the opportunity for Mr. Scripps to speak during sentencing under Federal Rule of Criminal Procedure 32(i)(4)(A)(ii).[360] Trial counsel told the district court he discussed the issue with his client, and Mr. Scripps did not wish to exercise his right to allocution.[361] At sentencing, the district court, concluding "[t]here's nothing in this record from which I could fairly conclude there's any remorse whatsoever," sentenced Mr. Scripps to the maximum period of incarceration with the Guidelines range for his offense.[362]

Mr. Scripps filed a habeas petition under 28 U.S.C. § 2255 after an unsuccessful appeal arguing the district court erred in denying his request for an evidentiary hearing on his ineffectiveness of appellate counsel claim for failing to raise the trial court's Rule 32 error on direct appeal. Reviewing the district court on an abuse of discretion standard, our Court of Appeals first recognized the standard a "district court must hold an evidentiary hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'"[363] Reviewing the record, the court of appeals found it did "not conclusively show that Scripps is not entitled to habeas relief for his ineffective assistance of appellate counsel claim. We cannot determine whether counsel's conduct fell below an objective standard of reasonableness for, while it would be highly unusual for counsel to omit such a clearly meritorious argument, nonetheless counsel may have had reasons for doing so."[364] Without an evidentiary hearing, the court "[did] not know whether counsel had strategic reasons for failing to raise this error on appeal, and therefore, we cannot conclude as a matter of law that counsel was ineffective" under *Strickland*.[365]

Mr. Heyward's record is distinguishable from the record in *Scripps*. We do not believe further factual development is required. Applying the standard, we find the parties' briefing at the

48

state level and the extensive record in this case "conclusively show[s] [Mr. Heyward] is entitled to no relief." Under *Scripps*, we need not hold an evidentiary hearing.

## J.     We deny a certificate of appealability.

"[A] state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition."[366] Section 2253 provides the standard for a certificate of appealability required for appellate review of a district court's judgment denying habeas relief:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).[367]

A certificate of appealability "will issue only if the requirements of § 2253 have been satisfied."[368] A habeas petitioner seeking a certificate of appealability "need only demonstrate 'a substantial showing of the denial of a constitutional right.'"[369] A petitioner "satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his

49

constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[370]

Federal Rule of Appellate Procedure 22 contemplates a district court issuing a certificate of appealability in the first instance: "(b) Certificate of Appealability. (1) In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court, or in a 28 U.S.C. § 2255 proceeding, the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c). If an applicant files a notice of appeal, the district clerk must send to the court of appeals the certificate (if any) and the statement described in Rule 11(a) of the Rules Governing Proceedings Under 28 U.S.C. § 2254 or § 2255 (if any), along with the notice of appeal and the file of the district-court proceedings. If the district judge has denied the certificate, the applicant may request a circuit judge to issue it."[371]

Given the standard we apply today to habeas challenges to state trial court evidentiary rulings and ineffectiveness of counsel, we cannot find jurists of reason could disagree with our reasoning in denying the petition.

## III.    Conclusion

Mr. Heyward does not meet the burden set by Congress and the Supreme Court for a writ of habeas corpus on his evidentiary and ineffective assistance grounds. We deny his petition and find no basis for a certificate of appealability.

---

[1] Criminal Compl., *Commonwealth v. Heyward*, No. 51-35909-2013 (Pa. Commw. Ct. Sept. 13, 2013).

[2] N.T. Oct. 27, 2014, pp. 218-19.

[3] *Id.* at 219-22.

[4] *Id.* at 223-24.

[5] N.T. Oct. 28, 2014, p. 124.

[6] *Id.* at 125.

[7] *Id.* at 127, 130-31.

[8] *Id.* at 130-31.

[9] *Id.*

[10] *Id.*

[11] *Id.* at 131-32.

[12] *Id.*

[13] *Id.* at 132-33.

[14] *Id.* at 133-34.

[15] *Id.* at 134-35.

[16] *Id.* at 137-38.

[17] *Id.* at 141-43.

[18] *Id.*

[19] *Id.* at 143-44.

[20] *Id.* at 144.

[21] *Id.* at 145-46.

[22] *Id.* at 147-48.

[23] *Id.* at 148-49.

[24] *See, e.g., id.* at 160-68.

[25] *Id.* at 160-62.

[26] *Id.* at 163-69.

[27] *Id.* at 186-89.

[28] *Id.*

[29] *Id.* at 183-85; 191-92.

[30] *Id.* at 203.

[31] *Id.* at 203-205.

[32] *Id.* at 205.

[33] *Id.*

[34] N.T. Oct. 29, 2014, pp. 78-79.

[35] *Id.*

[36] *Id.* at 79.

[37] *Id.*

[38] *Id.* at 81-82.

[39] *Id.* at 82-83.

[40] *Id.* at 83.

[41] *Id.*

[42] *Id.* at 83-86.

[43] *Id.* at 85-87.

[44] *Id.* at 83, 87.

[45] *Id.* at 83.

[46] *Id.* at 88-89.

[47] *Id.* at 89-91, 94.

[48] *Id.* at 90.

[49] *Id.*

[50] *Id.*

[51] *Id.* at 91.

[52] *Id.* at 91-92.

[53] *Id.* at 81-84.

[54] *Id.*

[55] *Id.* at 84.

[56] *Id.* at 108.

[57] *Id.* at 109.

[58] *Id.*

[59] N.T. Oct. 28, 2014, pp. 74-80.

[60] *Id.* at 82-84.

[61] *Id.* at 85, 94.

[62] *Id.* at 84, 93-94.

[63] *Id.* at 106.

[64] *Id.* at 110.

[65] *Id.* at 110-11.

[66] *Id.* at 116-17.

[67] *Id.*

[68] *Id.*

[69] *Id.* at 119-20.

[70] N.T. Oct. 28, 2014, pp. 207-10, 212.

[71] *Id.* at 208-10.

[72] N.T. Oct. 29, 2014, pp. 9-18.

[73] *Id.* at 11-18, 28-30.

[74] N.T. Oct. 30, 2014, pp. 13-17.

[75] N.T. Oct. 29, 2014, pp. 22-23.

[76] *Id.* at 22-26.

[77] *Id.* at 21-22.

[78] *Id.* at 31.

[79] *Id.* at 35-36, 38, 43.

[80] *Id.* at 39.

[81] *Id.* at 49-52.

[82] *Id.* at 50.

[83] *Id.* at 56-57.

[84] *Id.* at 59.

[85] *Id.* at 61-62.

[86] *Id.* at 63.

[87] *Id.* at 66-68.

[88] *Id.* at 67.

[89] *Id.* at 68.

[90] *Id.* at 67-69; N.T. Oct. 30, 2014, pp. 17, 21.

[91] N.T. Oct. 29, 2014, pp. 114-15.

[92] *Id.* at 115.

[93] *Id.* at 115-16.

[94] *Id.* at 116.

[95] *Id.* at 116, 119, 123-24.

[96] *Id.* at 121.

[97] *Id.* at 117-18.

[98] *Id.* at 120.

[99] *Id.* at 120-21.

[100] *Id.* at 122.

[101] *Id.* at 125.

[102] *Id.* at 126.

[103] *Id.*

[104] *Id.* at 127-28.

[105] *Id.* at 128-29.

[106] *Id.* at 140-42.

[107] *Id.* at 144.

[108] *Id.* at 147-48.

[109] *Id.* at 148-49.

[110] *Id.* at 149.

[111] *Id.* at 150-55.

[112] *Id.* at 130-31.

[113] *Id.* at 132-35.

[114] *Id.* at 135-36.

[115] *Id.* at 136-37.

[116] *Id.* at 137.

[117] *Id.* at 155-57.

[118] *Id.* at 158-59.

[119] *Id.* at 159.

[120] *Id.* at 159-60.

[121] *Id.* at 160.

[122] *Id.* at 162-64.

[123] *Id.* at 164.

[124] *Id.* at 168-69.

[125] *Id.*

[126] *Id.* at 172.

[127] *Id.* at 172-74.

[128] *Id.*

[129] N.T. Oct. 30, 2014, pp. 33-35.

[130] *Id.* at 36-37.

[131] *Id.* at 37-39.

[132] *Id.* at 43-50, 56-57.

[133] *Id.* at 45.

[134] *Id.*

[135] *Id.* at 50-53.

[136] *Id.* at 54.

[137] *Id.* at 54-55.

[138] *Id.* at 83, 92.

[139] *Id.* at 97-98.

[140] *Id.* at 98.

[141] *Id.* at 99.

[142] *Id.* at 100-12.

[143] *Id.* at 107-09.

[144] *Id.* at 109-12.

[145] N.T. Oct. 31, 2014, pp. 27-39.

[146] N.T. Nov. 3, 2014, pp. 4-9.

[147] N.T. Jan. 8, 2015, p. 17.

[148] *Id.*

[149] Post-Sentence Motions, *Commonwealth v. Heyward*, No. 51-12398-2013 (Ct. Com. Pl. Jan 14, 2015).

[150] *Id.* ¶ 1.

[151] *Id.* ¶ 3.

[152] *Id.* ¶ 2.

[153] Order, *Commonwealth v. Heyward*, No. 51-12398-2013 (Ct. Com. Pl. May 14, 2015).

[154] Notice of Appeal, *Commonwealth v. Heyward*, No. 51-12398-2013 (Ct. Com. Pl. May 15, 2015).

[155] Concise Statement of Errors Complained of on Appeal, *Commonwealth v. Heyward*, No. 51-12398-2013 (Ct. Com. Pl. June 10, 2015).

[156] *Id.* ¶ 1.

[157] *Id.* ¶ 2.

[158] *Id.* ¶¶ 3-7.

[159] Opinion, *Commonwealth v. Heyward*, No. 51-12398-2013 (Ct. Com. Pl. Nov. 4, 2015) ["Trial Ct. Op."].

[160] *Id.* at 23.

[161] *Id.*

[162] *Id.*

[163] *Id.* at 24-26.

[164] *Id.* at 25.

[165] *Id.* at 25-26.

[166] *Id.* at 26-28.

[167] *Id.* at 26.

[168] *Id.* at 27-28.

[169] *Id.* at 29-30.

[170] *Id.* at 30.

[171] *Id.* at 31-32.

[172] *Id.*

[173] *Id.* at 32-33.

[174] *Id.* at 33.

[175] *Id.*

[176] *Id.*

[177] *Id.* at 34-35.

[178] *Id.*

[179] *Commonwealth v. Heyward*, No. 1408 EDA 2015, 2016 WL 5266667 (Pa. Super. Ct. July 22, 2016).

[180] *Commonwealth v. Heyward*, 164 A.3d 466 (Pa. 2016).

[181] *See* ECF Doc. No. 8-1.

[182] *Id.* at 60-72.

[183] *Id.*

[184] *Id.* at 65-68.

[185] *Id.* at 66.

[186] *Id.* at 64-65.

[187] *Id.* at 65.

[188] *Id.*

[189] *Id.* at 68-69.

[190] *Id.* at 69.

[191] *Id.*

[192] *Id.* at 68-69. The post-conviction court explained, even if the Commonwealth did not obtain a search warrant for the records, trial counsel could not be held responsible for predicting post-trial changes in the law requiring a search warrant for cell-site location information. *Id.* at 68.

[193] *Id.* at 69-70.

[194] *Id.* at 70.

[195] *Id.*

[196] *Id.* at 69.

[197] *Id.*

[198] *Id.* at 70-71.

[199] *Id.*

[200] *Id.* at 71.

[201] *Commonwealth v. Heyward*, 242 A.3d 391 (Pa. Super. Ct. 2020) (unpublished table opinion).

[202] *See* ECF Doc. No. 1 at 21-22.

[203] 28 U.S.C. § 2254(d).

[204] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997) and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)) (footnote omitted).

[205] *Williams v. Taylor*, 529 U.S. 362, 410 (2000).

[206] *Id.* at 409.

[207] *Renico*, 559 U.S. at 773 (quoting *Williams*, 529 U.S. at 411).

[208] *Id.* (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

[209] *Woods v. Etherton*, 136 S.Ct. 1149, 1151 (2016) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)); *Burt v. Titlow*, 571 U.S. 12, 19-20 (2013) (quoting *Harrington*, 562 U.S. at 102-103).

[210] *Rountree v. Balicki*, 640 F.3d 530, 537–38 (3d Cir. 2011); *Taylor v. Horn*, 504 F.3d 416, 433 (3d Cir. 2007).

[211] 28 U.S.C. § 2254(e)(1).

[212] *Woods*, 136 S.Ct. at 1151 (quoting *Burt*, 571 U.S. at 22) (internal citation omitted).

[213] *Id.* (quoting *Burt* at 15).

[214] *Gibbs v. Adm'r New Jersey State Prison*, 814 F. App'x 686, 689 n. 6 (3d Cir. 2020) (citing *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018)). We "look through" higher state courts' unexplained decisions to the last reasoned decision and make a rebuttable presumption that higher courts adopted this rationale. *Wilson*, 138 S.Ct. at 1193.

[215] *See Abdul-Shabazz v. Adm'r E. Jersey State Prison,* 799 F. App'x 167, 169 n. 2 (3d Cir. 2020) (citing *Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008)).

[216] Concise Statement of Errors Complained of on Appeal, ¶ 1.

[217] *Id.*

[218] ECF Doc. No. 8 at 8-9.

[219] *Williams v. Collins*, No. 10-4995, 2011 WL 7089329, at *10 (E.D. Pa. Aug. 31, 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 316) (2011)).

[220] 443 U.S. 307, 324 (1979).

[221] *Id.* at 318-19 (citations and quotations omitted).

[222] *Commonwealth v. Heyward*, No. 51-1398-2013, at 22 (Ct. Com. P. Nov. 4, 2015) (citing *Commonwealth v. Koehler*, 737 A.2d 225, 233-34 (Pa. 1999)).

[223] *Id.* (citing *Commonwealth v. Anderson*, 650 A.2d 20, 24 (Pa. 1994)) (second and third citations omitted).

[224] *Id.* at 23.

[225] *Id.*

[226] *Id.*

[227] *Id.*

[228] *Id.*

[229] *Id.*

[230] Concise Statement of Errors Complained of on Appeal, ¶ 2.

[231] *See* ECF Doc. No. 8 at 9-10.

[232] *Grimsley v. McGinley*, No. 16-1118, 2017 WL 11606916, at *23 (E.D. Pa. Aug. 22, 2017), *report and recommendation adopted*, No. 16-1118, 2017 WL 11606915 (E.D. Pa. Nov. 28, 2017) (citing *Tibbs v. Florida*, 457 U.S. 31, 37-38 (1982)).

[233] *Id.* (citing *Marshall v. Lonberger*, 459 U.S. 422, 434-35 (1983)).

[234] *Id.* (citing *Quang Van Nguyen v. Wenerowicz*, No. 12-CV-06631, 2013 WL 6473264, at *5 (E.D. Pa. Dec. 10, 2013); *Williams v. Collins*, No. 10-4995, 2011 WL 7089329, at *5 (E.D. Pa. Aug. 31, 2011), *report and recommendation adopted*, No. 10-4995, 2012 WL 204079 (E.D. Pa. Jan. 24, 2012); *Alamo v. Frank*, No. 97-3022, 1999 WL 79659, at *1 (E.D. Pa. Jan. 15, 1999)).

[235] Concise Statement of Errors Complained of on Appeal, ¶ 3.

[236] *Heyward*, No. 2016 WL 5266667 at *3 (quoting Br. for Appellant at 55).

[237] ECF Doc. No. 8 at 10-11.

[238] *Heyward*, 2016 WL 5266667 at *4 (quoting Pa. R. E. 404(b)(1)).

[239] *Id.* (quoting Pa. R. E. 404(b)(2)).

[240] *Id.*

[241] *Id.* (quoting *Commonwealth v. Dillon*, 925 A.2d 131, 136-37 (Pa. 2007); *Commonwealth v. Lark*, 543 A.2d 491, 497 (Pa. 1988)).

[242] *Id.* at *4-5.

[243] *Id.*

[244] *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

[245] *Id.* at 68.

[246] *Bronshtein v. Horn*, 404 F.3d 700, 730 (3d Cir. 2005) (quoting *Lesko v. Owens*, 881 F.2d 44, 52 (3d Cir.1989)).

[247] *Allison v. Superintendent Waymart SCI*, 703 F. App'x 91, 97 (3d Cir. 2017) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974)).

[248] Concise Statement of Errors Complained of on Appeal, ¶ 4.

[249] ECF Doc. No. 8 at 11-12.

[250] N.T. Oct. 28, 2014 at 205.

[251] U.S. Const. amend. VI.

[252] *See Davis v. Alaska*, 415 U.S. 308, 315-16 (1974).

[253] *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

[254] *Id.*

[255] *Id.* (citation and quotations omitted) (emphasis in original).

[256] Trial Ct. Op. at 31.

[257] *Id.* at 32.

[258] Concise Statement of Errors Complained of on Appeal, ¶ 5.

[259] *Id.*

[260] ECF Doc. No. 8 at 13-14.

[261] *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (citing *Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *United States v. Bornman*, 559 F.3d 150, 156 (3d Cir.2009)).

[262] Concise Statement of Errors Complained of on Appeal, ¶ 5.

[263] *Id.*

[264] ECF Doc. No. 8 at 14-15.

[265] Trial Ct. Op. at 34-35.

[266] *Id.*

[267] *Heyward*, 2016 WL 5266667 at *7.

[268] *Estelle*, 502 U.S. at 67-68.

[269] *See Thomas v. Jackson*, No. 17-476, 2017 WL 2608753, at *4 (W.D. Mich. June 16, 2017) (concluding petitioner's claim that admission of lay testimony denied him a fair trial to be non-cognizable on federal habeas review).

[270] Concise Statement of Errors Complained of on Appeal, ¶ 7.

[271] *Id.*

[272] ECF Doc. No. 8 at 15-16.

[273] *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

[274] *Id.*

[275] *Green v. Grace*, No. 05-2887, 2005 WL 3542671, at *3-4 (E.D. Pa. Dec. 22, 2005) (concluding it could not review a trial court's decision not to give a voluntary manslaughter instruction because it solely implicated state law).

[276] 18 Pa. Cons. Stat. Ann. § 2503(a)(1).

[277] *Commonwealth v. Ragan*, 743 A.2d 390, 396-97 (Pa. 1999) (citations and quotations omitted).

[278] Trial Ct. Op. at 25-26.

[279] ECF Doc. No. 1 at 21.

[280] *Id.*

[281] *Gibbs*, 814 F. App'x at 689 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

[282] *United States v. Scripps*, 961 F.3d 626, 632 (3d Cir. 2020) (quoting *Strickland*, 466 U.S. at 688, 689, 694).

[283] *Commonwealth v. Colavita*, 993 A.2d 874, 886–87 (Pa. 2010) (quoting *Commonwealth v. Carson*, 913 A.2d 220, 233 (Pa. 2006)).

[284] *Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000).

[285] *Elias v. Superintendent Fayette SCI*, 774 F. App'x 745, 750 (3d Cir. 2019) (quoting 28 U.S.C. § 2254(d)).

[286] *Id.* (quoting *Collins v. Sec'y of Pa. Dep't of Corr.*, 742 F.3d 528, 546-47 (3d Cir. 2014)).

[287] *Gibbs*, 814 F. App'x at 689 (quoting *Strickland,* 466 U.S. at 687–88; *Harrington*, 562 U.S. at 105).

[288] ECF Doc. No. 1 at 21.

[289] ECF Doc. No. 8-1 at 58.

[290] *Heyward*, 242 A.3d at *4 (citing Am. PCRA Pet. at Ex. P1).

[291] ECF Doc. No. 8-1 at 64-65.

[292] 45 A.3d 1096 (Pa. 2012).

[293] ECF Doc. No. 8-1 at 64-65.

[294] 45 A.3d at 1108-09.

[295] *Id.* at 1109 (quoting *Commonwealth v. Gibson*, 951 A.2d 1110, 1137 (Pa. 2008)).

[296] *Id.* (citations and quotations omitted).

[297] ECF Doc. No. 8-1 at 65.

[298] *Id.*

[299] *Id.*

[300] *Id.*

[301] *Id.* (citing Am. PCRA Pet. at 55).

[302] *Heyward*, 242 A.3d at *5.

[303] *Id.* at *4 (quoting *Commonwealth v. Lippert*, 85 A.3d 1095, 1097 (Pa. Super. Ct. 2014)).

[304] *Id.* at *5.

[305] *Id.*

[306] *Id.*

[307] ECF Doc. No. 1 at 21.

[308] ECF Doc. No. 8-1 at 22.

[309] *Id.* at 19-20.

[310] N.T. Oct. 30, 2014, p. 130.

[311] ECF Doc. No. 8-1 at 66.

[312] *Id.*

[313] *Id.* at 66-68.

[314] Id. at 67 (quoting *Commonwealth v. Lawson*, 762 A.2d 753, 755 n.1 (Pa. Super. Ct. 2000)).

[315] *Heyward*, 242 A.3d at *6.

[316] *Id.* (quoting *Lawson*, 762 A.2d at 756).

[317] ECF Doc. No. 1 at 21.

[318] ECF Doc. No. 8-1 at 32-33.

[319] *Id.* at 74.

[320] *Id.* at 69.

[321] *Id.*

[322] *Heyward*, 242 A.3d at *7.

[323] *Id.* (citing *Commonwealth v. Johnson*, 966 A.2d 523, 535-36 (Pa. 2009)).

[324] *Johnson*, 966 A.2d at 535-36 (citations and quotations omitted) (emphasis added).

[325] *Heyward*, 242 A.3d at *7.

[326] *Id.*

[327] *Id.*

[328] ECF Doc. No. 1 at 21.

[329] ECF Doc. No. 8-1 at 76.

[330] *Id.* at 69-70.

[331] *Heyward*, 242 A.3d at *8.

[332] *Id.*

[333] ECF Doc. No. 1 at 21.

[334] ECF Doc. No. 8-1 at 45-51.

[335] N.T. Oct. 29, 2014, pp. 97-109.

[336] *Id.* at 109.

[337] *Id.*

[338] N.T. Oct. 30, 2014, pp. 150-51.

[339] *Heyward*, 242 A.3d at *9 (citing Am. PCRA Pet. at Ex. P12).

[340] ECF Doc. No. 8-1 at 70-71.

[341] *Id.*

[342] *Heyward*, 242 A.3d at *8-10.

[343] *Id.* at 10.

[344] ECF Doc. No. 1 at 21.

[345] ECF Doc. No. 8-1 at 27 (citing *Carpenter v. United States*, 819 F.3d 880 (2018)).

[346] ECF Doc. No. 8 at 20-21.

[347] ECF Doc. No. 8-1 at 68.

[348] *Id.*

[349] *Id.*

[350] ECF Doc. No. 1 at 21.

[351] ECF Doc. No. 8-1 at 71 (quoting *Commonwealth v. Tedford*, 960 A.2d 1, 56 (Pa. 2008)).

[352] *Heyward*, 242 A.3d at *10.

[353] *Id.* (quoting *Commonwealth v. Elliott*, 80 A.3d 415, 450 (Pa. 2013)).

[354] *Id.*

[355] *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (citing *Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2002)).

[356] *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993)).

[357] *Id.* (citing *Brecht*, 507 U.S. at 617).

[358] ECF Doc. No. 1 at 18.

[359] 961 F.3d 626 (2020).

[360] Federal Rule of Criminal Procedure 32(i)(4)(A)(ii) requires, *inter alia*, "Before imposing sentence, the court must: ... (ii) address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence ...."

[361] *Scripps*, 961 F.3d at 629.

[362] *Id.* at 630.

[363] *Id.* at 631-32 (quoting *United States v. McCoy*, 410 F.3d 124, 131 (3d Cir. 2005)).

[364] *Id.* at 634 (footnote omitted).

[365] *Id.* at 634-35.

[366] *Miller-El v. Cockrell*, 537 U.S. 322, 335–37 (2003) (citing 28 U.S.C. § 2253).

[367] 28 U.S.C. § 2253.

[368] *Miller-El*, 537 U.S. at 336.

[369] *Id.* at 327 (citing 28 U.S.C. § 2253(c)(2)).

[370] *Id.* at 323 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

[371] Fed. R. App. P. 22(b)(1).